**No. 10-3043**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**United States of America,**

*Plaintiff-Appellee*,

**v.**

**Leonel Rene Guerrero,**

*Defendant-Appellant*.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**
_____


**OPENING BRIEF OF APPELLANT LEONEL RENE GUERRERO**


April 1, 2011                     Douglas J. Behr (Bar No. 163998)
                                  Robert A. Sheffield (Bar No. 500464)
                                  Keller and Heckman LLP
                                  1001 G Street, N.W., Suite 500 West
                                  Washington, D.C. 20001
                                  Tel: (202) 434-4100
                                  Fax: (202) 434-4646

                                  Counsel for Leonel Rene Guerrero
                                  Appointed by the Court

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and *Amici*

The parties before the District Court in this case were the United States of America and Defendants Leonel Rene Guerrero and Jose Sacareas.  The parties before this Court are United States of America and Defendants Leonel Rene Guerrero.  There are no intervenors or *amici curiae*.

### B.    Ruling Under Review

The ruling under review is a verdict of guilty after a jury trial presided over by the Honorable James Robertson on May 19-21, 2009, in *United States v. Guerrero*, Case No. 08-cr-347.

Mr. Guerrero was sentenced on May 24, 2010, to time served plus 36 months of supervised release.  Judgment of the District Court ("Judgment") (Appendix for Appellant Leonel Rene Guerrero ("App.") 1-6).

### C.    Related Cases

There are no related cases before this Court or any other court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF JURISICTION ..........................................................1

STATEMENT OF THE ISSUES ON APPEAL ......................................1

STATEMENT OF THE CASE................................................................2

STATEMENT OF THE FACTS ............................................................4

SUMMARY OF THE ARGUMENT ..................................................19

ARGUMENT ....................................................................................21

I.      THE TRIAL COURT COMMITTED PLAIN ERROR IN ADMITTING
        OPINION TESTIMONY FROM THE SEIZING AGENT LINKING
        SEIZED OBJECTS TO COCAINE TRAFFICKING.................................21

        A.      Agent Drewniak's Opinion Testimony Was Inadmissible as Lay
                Opinion Testimony Under Federal Rule of Evidence 701.................22

        B.      Agent Drewniak's Opinion Testimony Was Inadmissible as Expert
                Testimony Under Federal Rule of Evidence 702..............................25

        C.      The Admission of Agent Drewniak's Opinion Testimony was
                Plainly Erroneous ...............................................................27

                1.      Admission of Agent Drewniak's Testimony was Clearly
                        Erroneous ...............................................................28

                2.      Admission of Agent Drewniak's Testimony Affected Mr.
                        Guerrero's Substantial Rights................................29

       3.     Admission of Agent Drewniak's Testimony Affected the
Fairness, Integrity, and Public Reputation of the Judicial
Proceedings ................................................................................31

II.     THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING
RELEVANT TESTIMONY BY MR. GUERRERO'S LOW-VISION
EXPERT, DR. STEPHEN FEINBERG ........................................................33

III.    THE TRIAL COURT ERRED IN PERMITTING THE GOVERNMENT
TO CROSS EXAMINE MR. GUERRERO'S CHARACTER WITNESS
WITH GUILT-ASSUMING HYPOTHETICALS ........................................37

IV.    THE CUMULATIVE IMPACT OF THE ERRORS IN MR. GUERRERO'S
TRIAL REQUIRES REVERSAL OF HIS CONVICTION .........................43

CONCLUSION ................................................................................45

CERTIFICATE OF COMPLIANCE ................................................................46

CERTIFICATE OF SERVICE ................................................................47

# TABLE OF AUTHORITIES[1]

**Cases**

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)....................................44

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................................34

*Johnson v. United States*, 520 U.S. 461 (1997) ..................................................28, 31

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...............................................43, 44

*United States v. Anderson*, 851 F.2d 384 (D.C. Cir. 1988) .....................................36

*United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992)....................................25, 28

*United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977) ............40, 42

*United States v. Eiland*, 2006 WL 2844921 (D.D.C. 2006) ....................................22

*United States v. Edwards*, 76 Fed. Appx. 335 (D.C. Cir. 2003)..............................40

*United States v. Fennell*, 53 F.3d 1296 (D.C. Cir. 1995) ........................................28

*\*United States v. Garcia,* 413 F.3d 201 (2d Cir. 2005)..................23, 24, 29, 30, 31

*United States v. Grinage*, 390 F.3d 746 (7th Cir. 2004)..........................................24

*United States v. Guzman*, 167 F.3d 1350 (11th Cir. 1999) .....................................40

*United States v. Lampkin*, 159 F.3d 607 (D.C. Cir. 1998).......................................34

*United States v. Mason*, 993 F.2d 406 (4th Cir. 1993) ............................................40

*United States v. Marcus*, 130 S. Ct. 2159 (2010) .......................................27, 29, 31

*United States v. Marquez*, 653 F.Supp.2d 1 (D.D.C. 2009) ....................................44

---

[1] Authorities upon which we chiefly rely are marked with an asterisk.

*United States v. McGuire*, 744 F.2d 1197 (6th Cir. 1990)......................................40

*United States v. Morgan*, 554 F.2d 31 (2d Cir. 1977) ................................41, 42, 43

*United States v. Olano*, 507 U.S. 725 (1993) .......................................27, 28, 29, 31

*United States v. Oriedo*, 498 F.3d 593 (7th Cir. 2007) ..........................................23

*\*United States v. Oshatz*, 912 F.2d 534 (2d Cir. 1990).........................39, 40, 42, 43

*United States v. Palmere*, 547 F.2d 105 (5th Cir. 1978) ...................................41, 42

*United States v. Polsinelli*, 649 F.2d 793 (10th Cir. 1981) ...............................41, 42

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) .......................................44

*United States v. Salamanca*, 990 F.2d 629 (D.C. Cir. 1993)............................33, 35

*United States v. Schwayder*, 312 F.3d 1109 (9th Cir. 2002) .................................40

*United States v. Simmons*, 431 F.Supp.2d 38 (D.D.C. 2006) .................................44

*United States v. Smart*, 98 F.3d 1379 (D.C. Cir. 1996).....................................33, 34

*United States v. Wallace*, 848 F.2d 1464 (9th Cir. 1988).......................................44

*United States v. White*, 887 F.2d 267 (D.C. Cir. 1989) .........................40, 41, 42, 43

*\*United States v. Williams*, 212 F.3d 1305 (D.C. Cir. 2000) ...............23, 25, 26, 28

*United States v. Williams*, 738 F.2d 172 (7th Cir. 1984)...................................39, 40

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) ......................22, 23, 24, 28

*United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000)....................................43, 44

**Statutes**

18 U.S.C. § 2 ..............................................................................................................2

18 U.S.C. § 3231 ..................................................................................1

21 U.S.C. § 841(a)(1) ...........................................................................2

21 U.S.C. § 841(b)(1)(C) ......................................................................2

28 U.S.C. § 1291 ...................................................................................1

**Rules**

Fed. R. Crim. P. 52(b) .........................................................................27

Fed. R. Evid. 701 ................................................................ 22, 23, 24 34

Fed. R. Evid. 701, Advisory Committee Notes on 2000 Amendments............22, 24

Fed. R. Evid. 702 ........................................... 1, 22, 24, 25, 26, 27, 28, 32

Fed. R. Evid. 704 .................................................................................35

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  This appeal is from the May 24, 2010, final judgment of the United States District Court for the District of Columbia, which disposed of all issues in the case.  Judgment (App. 1-6).

Mr. Guerrero timely filed a notice of appeal from the final judgment of the District Court on May 25, 2010.  Notice of Appeal (App. 7-8).

## STATEMENT OF THE ISSUES ON APPEAL

I.     Did the District Court commit plain error by permitting the prosecution to elicit expert opinion testimony from a law-enforcement officer linking seized property to narcotic trafficking without first qualifying that officer as an expert witness and without ensuring that his testimony satisfied the requirements of Federal Rule of Evidence 702 even though the Court had previously prevented such testimony from a different law enforcement officer?

II.    Did the District Court abuse its discretion when it prevented Mr. Guerrero's duly-qualified expert witness from testifying to his opinion that, given Mr. Guerrero's extremely poor vision, Mr. Guerrero could not perform the activities that he was charged with, to wit:  measuring, cutting and packaging cocaine?

III.    Did the District Court err when it permitted the prosecution to cross examine Mr. Guerrero's opinion character witness with questions that assumed Mr. Guerrero was guilty of the crime for which he was on trial?

IV.    Does the cumulative impact of the errors at Mr. Guerrero's trial require a reversal of his conviction?

## STATEMENT OF THE CASE

On October 17, 2008, Leonel Rene Guerrero and Jose Sacareas were arrested after special agents with U.S. Immigration and Customs Enforcement ("ICE") performed a controlled delivery of a package containing cocaine to 639 Farragut Street NW and after the execution of a search warrant at that address. On November 20, 2008, Mr. Guerrero and Jose Sacareas were indicted on one count of unlawful possession with intent to distribute cocaine and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 2.  Indictment (App. 9).  On December 19, 2008, Mr. Sacareas entered a plea of guilty, and his case was severed.

Mr. Guerrero had a jury trial before the Honorable James Robertson on May 19-21, 2009.  The jury returned a guilty verdict on May 22, 2009.  Verdict (App. 10).

On May 26, 2009, counsel for Mr. Guerrero filed a motion for a mistrial, Doc. No. 41, asserting that she ineffectively assisted Mr. Guerrero by failing to

make a clear record, failing to object when the trial court allegedly unfairly influenced and caused Mr. Guerrero not to testify, and failing to request continuances to enable her to better prepare. *Id.* at 1-2. The trial court denied this motion.

On August 14, 2009, Mr. Guerrero filed a Motion for Judgment of Acquittal or For a New Trial. Doc. No. 60. In the motion, Mr. Guerrero argued that the evidence adduced at trial was insufficient to prove Mr. Guerrero's knowledge of the existence of contraband or his intent to exercise dominion and control over it. *Id.* The District Court denied the motion by minute order on May 24, 2010.

On August 26, 2009, counsel for Mr. Guerrero filed a motion for a determination of Mr. Guerrero's competency to stand trial *nunc pro tunc*. Doc. No. 61. The motion was denied on May 24, 2010. Transcript of Motion Hearing and Sentencing, May 24, 2010, at 73 (App. 11).

Mr. Guerrero was sentenced on May 24, 2010, to time served followed by 36 months of supervised release. *Id.* at 78 (App. 12). *See also* Judgment (App. 1-6).

On May 25, 2010, Mr. Guerrero timely noted his appeal. Notice of Appeal (App. 7-8).

## STATEMENT OF THE FACTS

On October 15, 2008, at Miami International Airport, U.S. Immigration and Customs Enforcement ("ICE") agents intercepted a package coming into the United States from El Salvador and addressed to Carlos Lopez, 639 Farragut Street NW, Washington, DC.  Trial Transcript of May 19, 2009 ("5/19/09 Tr.") at 27-28 (App. 15-16).  An x-ray of the package revealed a statue of an angel inside.  Agents removed the statue and drilled into it finding white powder that field tested as cocaine.[2]  *Id.* at 22, 29-32 (App. 14, 17-20).  Agents then found a plastic bag of white powder secreted inside the statue.  ICE agents in Miami then contacted agents in Washington, DC, who agreed to do a controlled delivery of the package.  *Id.* at 32, 45 (App. 20, 21).  The package was re-assembled, re-sealed and sent to Washington, DC.  *Id.* at 46-47 (App. 22-23).

ICE agents in Washington obtained an anticipatory search warrant on October 16 for the entire premises of 639 Farragut Street NW.  *Id.* at 58-59 (App. 24-25).  The warrant was contingent on an individual at 639 Farragut Street NW accepting the package.  *Id.* at 61 (App. 26).  ICE agents also installed a transmitter and trip wire inside the package to track its movement and to alert agents if it was opened.  *Id.* at 61-62 (App. 26-27).

---

[2]     A Drug Enforcement Administration forensic chemist testified that the package contained 302.6 grams of cocaine.  Trial Transcript of May 20, 2009, at 80-81 (App. 66).

4

On October 17, 2008, at around 11:00 am, Special Agent Tony Rodriguez, posing as a DHL employee, delivered the package to 639 Farragut Street NW.  *Id.* at 66 (App. 28).  Mr. Guerrero answered the door.  Agent Rodriguez testified that he informed Mr. Guerrero that he had a package for Carlos Lopez and asked whether Carlos Lopez was in the house.  *Id.*  According to Agent Rodriguez, Mr. Guerrero said "something to the effect" that Mr. Lopez "used to live here but he stays here sometimes."  *Id.*  The agent then said:  "This is for Carlos are you going to take it?"  *Id*. at 86 (App. 34).  Subsequently, Mr. Guerrero agreed to sign for the package.  Agent Rodriguez described Mr. Guerrero as appearing nervous and asserted that he signed for the package as "Leonel Herrera," which the agent confirmed by spelling it for Mr. Guerrero.  *Id.* at 67-68 (App. 29-30).  According to the agent, Mr. Guerrero had difficulty understanding what he was being asked to do and where to sign for the package.  *Id.* at 87 (App. 35).  According to Rodriguez, the delivery and his interaction with Mr. Guerrero lasted no more than 60 seconds.  *Id.* at 70 (App. 32). On cross-examination, Agent Rodriguez acknowledged that Mr. Guerrero stated that he had "just woken up."  *Id*. at 86 (App. 34).

About five or ten minutes after the delivery of the package, the transmitter emitted a signal indicating that the package had been opened.  *Id.* at 70-71 (App.

5

32-33).  Between 10 and 12 ICE agents immediately executed the search warrant on the residence.  *Id.* at 93 (App. 40).

All agents entered the house through the front door.  *Id.* at 93 (App. 40).  Upon entering, the agents encountered two women who rented rooms in the house.  *Id.* at 94 (App. 41).  The agents secured the upstairs two floors.  *Id.* at 93 (App. 40).  The package was not found at that time.

Several agents then proceeded through the kitchen, out the back door into the back yard, down some steps and into the basement unit.  *Id.* at 95-96 (App. 42-43).  The basement unit is a separate dwelling unit that was inaccessible from inside the main part of the house.  Trial Transcript of May 20, 2009 ("5/20/09 Tr.") at 80-81 (App. 66).  It had a separate entrance and exit directly to the outside world.  5/19/09 Tr. at 93-94 (App. 40-41).

Agents found Mr. Guerrero and Jose Sacareas, who lived in the basement unit, along with a third individual who also rented a room in the basement.  *Id.* at 88, 96 (App. 36, 43).  When agents entered the basement, Mr. Sacareas was near the front of the basement, the part underneath the front door of the house, and away from the door to the basement.  *Id.* at 97-98 (App. 44-45).  Mr. Guerrero was at the rear of the basement, about to exit and return to the main part of the house.  *Id.* at 98 (App. 45).  There were two rooms in the basement.  *Id.* at 71 (App. 33).  One of those rooms, the one in the front of the basement, was identified as belonging to

6

Mr. Sacareas. *Id.* at 88, 90 (App. 36, 37). The DHL box, the statue and the statue's base were all found in Mr. Sacareas' room. 5/20/09 Tr. at 80-81 (App. 66). Green packets containing cocaine, a plastic baggie containing cocaine, creatine and $1,600 were found in Mr. Sacareas' room as well. *Id.* at 88, 90-92 (App. 67, 68). Agents then arrested Mr. Guerrero and Mr. Sacareas. Mr. Guerrero had no cocaine on his person at the time of his arrest. *Id.* at 103 (App. 69).

After the arrests, agents returned to the main part of the house to continue the search. Agent Rodriguez testified for the government about the execution of the search warrant. After cross-examination, during which defense counsel offered photographs of narcotics and alleged narcotics paraphernalia found in Mr. Sacareas' room, the prosecutor sought to have Agent Rodriguez "qualified as an expert." 5/19/09 Tr. at 103 (App. 46). The Court refused to allow the prosecutor to offer expert testimony at that time, telling the prosecutor that "[y]ou can address it at a later point but not now." *Id.*

Senior Special Agent Douglas Drewniak then testified for the government about the seizure of the property from Mr. Guerrero's bedroom. Agent Drewniak had been working for ICE for five years and previously worked for the U.S. Border Patrol for five years and the Federal Air Marshal Service for two years before that. *Id.* at 105 (App. 47). Agent Drewniak was not asked, and did not testify about, his job duties at ICE or his previous employers. Furthermore, he did not testify about

7

any training or on-the-job experience relating to narcotics usage and/or trafficking or the implements and methods used by narcotics traffickers.

Agent Drewniak testified that he found in Mr. Guerrero's bedroom, and seized, several green baggies in a dresser and in a nightstand, *id.* at 116, 118 (App. 50, 51); two small coffee grinders in a nightstand, *id.* at 119 (App. 52); a container of creatine in a dresser, *id.* at 116 (App. 50); a small digital scale in a dresser, *id.* at 120 (App. 53); a ceramic bowl in a dresser, *id.* at 122 (App. 54); and a white teaspoon and gloves in the ceramic bowl. *Id.* at 125-26 (App. 55-56); *5/20/09 Tr.* at 6 (App. 58). He also testified seized a razor blade holder with no blade in it. 5/19/09 Tr. at 127 (App. 57). None of the items were fingerprint tested. 5/20/09 Tr. at 114-15 (App. 71).

The government then elicited expert testimony from Agent Drewniak without first offering him as an expert or otherwise seeking to have him qualified. Drewniak was asked, and gave, his opinion about how each of the items he seized had a narcotics-related use. In response to questions from the prosecutor, Agent Drewniak opined that "the little green baggie . . . is consistent with narcotics distribution activity," 5/19/09 Tr. at 116 (App. 50); that "these types of machines [coffee grinders] are typically employed in order to mix pure powder cocaine with diluting or cutting agents, such as creatine," *id.* at 119 (App. 52); that creatine "is typically employed to dilute or cut powder cocaine, therefore, by increasing the

volume to be distributed," *id.* at 116 (App. 50); that digital scales are "typically employed to measure small quantities of weight, such as weights of cocaine that is distributed on the streets," *id.* at 120-121 (App. 53, 13); that the ceramic bowl "is typically employed to hold small quantities of powder cocaine or could be used in such a fashion," *id.* at 122 (App. 54); that the spoon "could typically be used to scoop and move small amounts of cocaine," *id.* at 125 (App. 55); and that gloves "are used by people who distribute cocaine.  They use them in order to keep the actual cocaine . . . from being absorbed in the skin."  5/20/09 Tr. at 6 (App. 58). He did not offer any expert testimony about the razor blade holder.

The government then called three forensic chemists to testify that (1) there was 302.6 grams of cocaine inside the package that was delivered to 639 Farragut Street NW, (2) the plastic bag and seven small Ziploc bags found in Mr. Sacareas' room contained cocaine but no creatine, and (3) the coffee grinders and digital scale found in Mr. Guerrero's bedroom contained cocaine residue.  *Id.* at 41, 48-50, 54-55, 57-59 (App. 59, 60-61, 62-63).  Each of the chemists was asked about creatine and testified that it is sometimes added to cocaine to "make the amount bulkier, to dilute it," *id.* at 52 (App. 61), and that it is sometimes used as a cutting agent in cocaine.  *Id.* at 46, 68 (App. 60, 64).  There was testimony that it is possible to test gloves, a spoon, and a plastic bowl for cocaine residue but that no such testing had been done.  *Id.* at 53-54 (App. 61-62).

Next the government called Special Agent John Armbruster, the case agent. *Id.* at 71 (App. 65). Agent Armbruster testified that the scale and coffee grinders seized from Mr. Guerrero's bedroom could not be used without leaving fingerprints on them. *Id.* at 112-13 (App. 70). Agent Armbruster also testified that neither of these items was ever fingerprint tested. *Id.* at 114-15 (App. 71). Agent Armbruster also testified that creatine is used as a cutting agent in the drug trade but that no creatine was found in any of the cocaine seized from 639 Farragut Street NW. *Id.* at 118, 122 (App. 72, 73).

The government's last two witnesses were the Executive Steward and the Head of Human Resources at the Washington Hilton. Mr. Guerrero worked at the Washington Hilton as a utility worker in the dish room and was employed in that capacity at the time of his arrest. *Id.* at 140 (App. 74). Each witness testified that he never observed anything that would lead him to believe that Mr. Guerrero had any problems with his eyesight. *Id.* at 140-41, 148-49 (App. 74, 75).

In defense, Mr. Guerrero called Jose Velasquez who had worked with Mr. Guerrero at the Washington Hilton two or three times a week for 14 years. *Id.* at 157-59 (App. 76-77). Mr. Velasquez testified that he knew Mr. Guerrero had eye problems from the first day they met. *Id.* at 163 (App. 78). Mr. Velasquez sometimes drove Mr. Guerrero to work, and when Mr. Guerrero paid him gas money, Mr. Guerrero often could not make out the denominations of the bills

because of his poor eyesight. *Id.* at 169 (App. 79). Mr. Velasquez testified that Mr. Guerrero was able to perform his job because often times two people would perform the same task, and at times Mr. Guerrero could use the other person's good eyesight to help him along. *Id.* at 163-64 (App. 78). Mr. Velasquez testified that in his opinion Mr Guerrero is law abiding and the charges filed against him did not affect that opinion. *Id.* at 165-66 (App. 78-79).

Christine Lacey, a neighbor, had known Mr. Guerrero for five years. *Id.* at 175 (App. 80). Ms. Lacey testified that in her opinion Mr. Guerrero is a law abiding and peaceful person. *Id.* at 178-79 (App. 81).

On cross-examination, the government asked Ms. Lacy the following six questions, each of which impermissibly assumed Mr. Guerrero's guilt.

> Q: Ma'am, knowing the charges, would that change, . . . your opinion of this defendant?
>
> A: No.
>
> Q: And if you were told there were two grinders with cocaine residue found in the defendant's bedroom, would that change your opinion?
>
> A: No.
>
> Q: What about empty Ziploc packets used for distributing cocaine. If you were told those were found in the defendant's bedroom, and a significant number, a significant more number [sic] in the basement, would that change your opinion?
>
> A: No.

> Q:  Would it change your opinion if you heard the defendant had a digital scale used for distributing cocaine in his bedroom, would that change your opinion, ma'am?
>
> A:  No.
>
> Q:  Would it change your opinion, ma'am, if you heard the testimony that the defendant received a packet, a gold statue laden with over 300 grams of cocaine on that day, and it was found in the basement.  Would that change your opinion?
>
> A:  No.
>
> Q:  And there were [sic] some other cocaine found in the basement or in one of the rooms.  Would that chance your opinion?
>
> A:  No.

*Id.* at 183-84 (App. 82).  Ms. Lacy also testified that she knew Mr. Guerrero had poor vision by the way he would hold paper money close to his eyes to discern its value.  *Id.* at 182 (App. 82).

Hilda Guerrero, Mr. Guerrero's wife, had lived at 639 Farragut Street NW until June 2008 at which time she moved out.  Trial Transcript of May 21, 2009 ("5/21/09 Tr.") at 11 (App. 88).  Mrs. Guerrero testified about the items seized from Mr. Guerrero's bedroom.  She testified that Mr. Guerrero wore the gloves at work to hold hot plates.  5/20/09 Tr. at 191 (App. 83).  She testified that she used the razor blades to sharpen her kids' pencils and that her kids used the spoon to eat gelatin.  *Id.* at 192-93 (App. 83).  Mrs. Guerrero also testified that she purchased the scale to weigh the gold that she imports from Peru and fashions into jewelry for

sale in the area and that Mr. Guerrero does not use the scale because he can't see well enough. *Id.* at 193-94 (App. 83-84). Ms. Guerrero also testified that the plastic baggies found in Mr. Guerrero's room were used to package Mr. Guerrero's personal medication to take to work with him. *Id.* at 197 (App. 84). Mrs. Guerrero said that Mr. Guerrero began using baggies for his medicine after once bringing a bottle of pills to work and accidentally spilling all the pills onto the ground. *Id.* Mrs. Guerrero testified that Mr. Guerrero never used the coffee grinders because he cannot see well enough to do so, *id.* at 198 (App. 85), and that she purchased the creatine for herself for medicinal purposes because it boosts muscle strength to help with her work as a housekeeper. 5/21/09 Tr. at 9-10 (App. 86-87). She testified that Mr. Guerrero also would use the creatine from time to time. *Id.* Mrs. Guerrero said that she left all the items behind when she left the house, leaving the scale and coffee grinders in the bedroom for safekeeping. *Id.* at 11-12, 21, 23 (App. 88-89, 90, 91).

The defense's final (and trial) witness was Dr. Stephen J. Feinberg. Dr. Feinberg is an optometrist who specializes in low vision and low-vision rehabilitation. *Id.* at 34 (App. 92). Dr. Feinberg had been a consultant to both the District Court and to the Department of Justice and had taught at Johns Hopkins and Howard University medical schools. *Id.* at 36 (App. 112). The government

conceded his expertise, and the trial judge permitted him to give expert opinion

testimony about low vision and low vision-rehabilitation.  *Id.* at 35 (App. 93).

Dr. Feinberg performed an examination on Mr. Guerrero to determine Mr.

Guerrero's visual acuity, that is, to determine his sharpness of vision and an

examination to determine the health of his eyes.  *Id.* at 45 (App. 97).  Dr. Feinberg

also reviewed Mr. Guerrero's medical charts going back to 1996 and his

medications, and also spoke with Mr. Guerrero's wife, sister, friends, and neighbor

to gather information about his vision and how he is functioning.  *Id.*

Dr. Feinberg found no normal architecture in the retina of Mr. Guerrero's

eyes.  *Id.* at 50 (App. 98).  The best acuity Dr. Feinberg was able to determine for

Mr. Guerrero was 20 over 2400 at five feet with corrective lenses.  *Id.* at 54 (App.

99).  Legal blindness is 20 over 200 at ten feet.  *Id.*  Dr. Feinberg concluded, in his

expertise, that Mr. Guerrero suffered from extremely low vision and that his

eyesight was 12 times worse than the baseline for legal blindness.  *Id.* at 59 (App.

100).  Dr. Feinberg testified that it would be "highly unlikely" that Mr. Guerrero

would discern powder on a silver or white surface.  *Id.* at 60 (App 101).

Defense counsel further sought to elicit Dr. Feinberg's opinion that Mr.

Guerrero's eyesight was so poor that he was incapable of performing the activities

that he was charged with, to wit:  measuring, cutting and packaging cocaine as the

government sought to prove.  As counsel was laying the foundation for such

testimony, the trial court interrupted, and the following exchange occurred:

> The Court:  Well, we need to focus this on what's relevant here, which is what he can see, what he could see in October 2008, what he could do. . . .
>
> Mr. Cole [Prosecutor]:  Your Honor, I believe counsel is going in some areas that are inappropriate.  I received a one-page, two paragraph report.  Dr. Feinberg, as I understand it, a week or two ago saw the defendant and made a determination of his current eyesight, not as it relates to 2008 or anything of that matter.  And also, he made – Dr. Feinberg made a factual determination specifically based on this report.  *I don't know if counsel is going to bring this out:  "I do not believe Mr. Guerrero has the visual ability to perform the activities for which he's been charged.*"
>
> The Court:  *Well, he's not going to give that testimony in this trial.*  We went over that yesterday.[3]  All I'm trying to get at, Ms. Shaner [Mr. Guerrero's trial counsel], is this jury is really fidgety.  I mean that this whole business – Ms. Guerrero went on for two hours, two and a half hours.  I don't want to learn all about the optometry science here.
>
> Now, it's up to you.  You can lose this jury or not.  But if you want to get right to the point, I suggest you do it.

*Id.* at 41-42 (App. 94-95) (emphasis added).

The trial judge later remarked, in apparent clarification of his decision to

exclude Dr. Feinberg's testimony:  "You've got all kinds of lay testimony already

---

[3]     The transcript of the previous day's proceedings contains nothing about this alleged ruling.

15

about what this man can see and can't see.  And I don't quarrel with your right to call an expert witness, I just don't want to – this can become a tail that wags this dog, and it's 11:00 o'clock and we were supposed to have finished this case yesterday afternoon."  *Id.* at 43 (App. 96).[4]

Notwithstanding the prosecution's objection to, and the trial court's exclusion of, this testimony, the prosecution asked Dr. Feinberg in its cross examination whether he has seen people with blindness commit criminal activities. *Id.* at 66 (App. 102).  Counsel objected, and the trial court, in reference to the excluded testimony, asked "Do you want to open the door to what you don't want her to ask?"  *Id.* at 67 (App. 103).  The prosecution then remarked, "I took it back. I'm moving on.  I know.  Thank you."  *Id.*

The defense rested after the testimony of Dr. Feinberg.

The government, in its closing argument, asked the jury to infer that the defense had no evidence about what Mr. Guerrero could or could not see.  The prosecutor told the jury, "Ms. Shaner [Mr. Guerrero's trial counsel] suggested that defendant couldn't have seen that [the items seized from Mr. Guerrero's bedroom],

---

[4]    In fact, up to that point, Mr. Guerrero only had testimony from Mrs. Guerrero about what he could and could not see.  Mr. Velasquez and Ms. Lacey testified only that they knew Mr. Guerrero generally had poor vision.  The prosecution, however, had called two of Mr. Guerrero's former colleagues to testify that they were not aware that Mr. Guerrero had any visual problems and that they would have known if he had had any based on the nature of their interaction at work.  *See supra.*

but there's no evidence other than what you heard that the defendant was the sole occupant of that bedroom." *Id.* at 93 (App. 107). The government again remarked, in its rebuttal, "So Ms. Shaner, if she says the defendant is blind, that's all right. She can say it 20 more times. But that's not a crime in America, to be visually impaired." *Id.* at 117-18 (App. 110-11).

Also in its closing argument, the prosecution made extensive references to Agent Drewniak's opinion testimony, further highlighting its importance to the case.[5] The prosecution made the following remarks about Agent Drewniak's expert testimony (and added a few "facts" of his own):

> You have heard some things that are very significant. You've also heard that creatine is used to cut cocaine to stretch it out to make it more. . . . *Id.* at 89-90 (App. 104-105).

> It is important for your evaluation to review all of the evidence and not take it in a vacuum. When you review the packets, the packets; the creatine, the creatine, there's only one inescapable conclusion based on the evidence,

---

[5] During its opening statement, the prosecution stated:

> The agents will testify that creatine is used as a cutting agent. A cutting agent for cocaine to make you have more profits and more money to stretch your cocaine. In this defendant's bedroom, also, you will hear that there was a digital scale with cocaine residue on its top, and all of this is in this defendant's bedroom. Digital scales, you will hear, are used in the drug trade to help weigh correctly the amounts of cocaine and to properly weigh them for the proper prices. *Id.*

17

that this defendant was in fact a distributor of cocaine. *Id.* at 91 (App. 106).

What is needed – based on what you heard, what is need to distribute cocaine?  The cocaine comes in; you have the cutting agent.  It might be harder; based on the testimony, you might need to soften it up and to put some other things in it.[6]  That's what the grinders were used for.  *Id.*

When you weigh cocaine, you don't want to give a $20 bag of cocaine an amount for a $5 bag, so you need some preciseness of it.  And that's the digital scale.  *Id.*

You've heard from one of the ICE, Immigration and Customs Enforcement agents, saying this plate is consistent with a plate to mix cocaine and other items and distribute it to others.  *Id.* at 93 (App. 107).

You saw the gloves where the agent said it could be used not to get the cocaine on your hand.  *Id.*

You've seen a razor blade holder, which is consistent in the cocaine trade to cut and move cocaine and for its packaging and distribution.  These are all factors that you have to consider.[7]  *Id.*

[O]ne thing you will have more than any other, the agent has testified about the spoon, these little small spoons. Clearly there are innocent ways that a spoon of this size could be used. . . . [B]ased on the testimony that you've heard, in Mr. Guerrero's room, and these spoons were found where there were implements to distribute cocaine. And the agents have told you – I think individually and collectively the two agents told you this spoon, in their capacity, has been used to distribute cocaine.  *Id.* at 94-95 (App. 108-09).

---

[6]     There was no testimony during the trial on this point.

[7]     There was no testimony during the trial on this point.

> The bowls that you have seen . . . you have heard about how cocaine is distributed, what is used to distribute cocaine, spoons, bowls, ceramic plates. All of these things are there. . . . The only thing that's there are implements to distribute cocaine. *Id.* at 95 (App. 109).

## SUMMARY OF THE ARGUMENT

The government's case against Mr. Guerrero was weak. It had no direct evidence of Mr. Guerrero's possession of cocaine, let alone his possession with intent to distribute cocaine. The only cocaine in the house was found in Mr. Sacareas' room in the basement, including the cocaine that ICE delivered. The government relied in this case primarily on the property seized from Mr. Guerrero's bedroom. While some of the property had traces of cocaine that could have implied personal use or contamination, the government relied on the improper opinion testimony of Agent Drewniak—testimony for which no foundation was laid and which was not legitimate lay opinion—to demonstrate that those items were used to distribute cocaine. Agent Drewniak opined that each piece of recovered property was linked to the packaging and distribution of cocaine – a point that the government emphasized, and expanded upon without basis, in its closing argument to the jury. Agent Drewniak's improper expert testimony was central to the government's case against Mr. Guerrero and there is at least a reasonable probability that it affected the jury's decision. The admission of Drewniak's testimony was therefore plain error requiring reversal.

Furthermore, expert testimony from Mr. Guerrero's vision expert, Dr. Feinberg, that Mr. Guerrero's eyesight was too poor to permit him to use the property seized from his bedroom to distribute cocaine, that is, to handle, cut and package cocaine, was kept from the jury by the trial judge even though the Court had recognized Dr. Feinberg's expertise and the relevance of his testimony. Because of the exclusion of Dr. Feinberg's testimony, the jury had only the conflicting lay testimony about the acuity of Mr. Guerrero's vision—another point that was exploited by the government in closing. The trial court's ruling was an abuse of discretion requiring reversal.

Finally, the court erred in permitting the prosecution to cross-examine Mr. Guerrero's opinion character witness with questions that assumed Mr. Guerrero was guilty of the very crime for which he was on trial. These so-called guilt-assuming hypotheticals repeatedly foisted the prosecution's theory of the case onto the jury and improperly suggested that the government had evidence of guilt beyond the evidence in the record. As such, they violated Mr. Guerrero's constitutionally-protected presumption of innocence, unduly prejudiced his ability to defend the charges against him, and violated Federal Rule of Evidence 405.

Each of these errors alone requires a new trial. In combination, there can be no doubt that Mr. Guerrero did not receive a fair trial and that reversal is required.

# ARGUMENT

## I. THE TRIAL COURT COMMITTED PLAIN ERROR IN ADMITTING OPINION TESTIMONY FROM THE SEIZING AGENT LINKING SEIZED OBJECTS TO COCAINE TRAFFICKING

Special Agent Douglas Drewniak opined, in response to questions from the prosecutor, that each of the items seized from Mr. Guerrero's bedroom was employed in the narcotics trade. This testimony was offered by the government without first having qualified Agent Drewniak as an expert or offering him as one to the trial court. Thus, without qualification, and without court acceptance and approval, the government elicited Agent Drewniak's opinion that:

> " the little green baggie with the picture of the apple is consistent with narcotics distribution activity."  5/19/09 Tr. at 116 (App. 50);

> "these types of machines [coffee grinders] are typically employed in order to mix pure powder cocaine with diluting or cutting agents, such as creatine."  *Id.* at 119 (App. 52);

> creatine "is typically employed to dilute or cut powder cocaine, therefore, by increasing the volume to be distributed."  *Id.* at 116 (App. 50);

> digital scales are "typically employed to measure small quantities of weight, such as weights of cocaine that is distributed on the streets."  *Id.* at 120-121 (App. 53, 13);

> the ceramic bowl "is typically employed to hold small quantities of powder cocaine or could be used in such a fashion."  *Id.* at 122 (App. 54);

> the teaspoon "could typically be used to scoop and move small amounts of cocaine," *id.* at 125 (App. 55); and,

> gloves "are used by people who distribute cocaine. They use them in order to keep the actual cocaine . . . from being absorbed in the skin." 5/20/09 Tr. at 6 (App. 58).

This testimony was improper.

### A.    Agent Drewniak's Opinion Testimony Was Inadmissible as Lay Opinion Under Federal Rule of Evidence 701

Under Federal Rule of Evidence 701, a fact witness may testify to opinions or inferences only when such opinions or inferences are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The purpose of subsection (c) was to clarify the distinction between lay and expert testimony and to ensure that any testimony "based on scientific, technical, or other specialized knowledge" is "scrutinized under the rules regulating expert opinion." Fed. R. Evid. 701, Advisory Committee Notes on 2000 Amendments; *United States v. Eiland*, 2006 WL 2844921, *4 n.8 (D.D.C. 2006).

Proper lay opinion testimony must be "the product of reasoning processes familiar to the average person in everyday life." *United States v. Wilson*, 605 F.3d 985, 1025 (D.C. Cir. 2010) (internal quotations omitted). Under this standard, federal agents are permitted to provide opinion testimony under Rule 701 so long

22

as it is "limited to what [the officer] observed in the search or to other facts derived exclusively from this particular investigation." *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007). Drewniak's testimony about the drug-trade uses of the items seized from Mr. Guerrero's bedroom fail all three prongs on Rule 701, and the trial court erred in permitting it.

First, Agent Drewniak did not have personal knowledge of how the seized items had been used or how Mr. Guerrero may have intended to use them. Agent Drewniak had personal knowledge only of the identity of the items seized from Mr. Guerrero's bedroom. Therefore, Agent Drewniak's testimony was not "rationally based" on his perceptions; rather it represented a departure from the boundaries of his personal knowledge. *See United States v. Garcia,* 413 F.3d 201, 211 (2d Cir. 2005). Indeed, Agent Drewniak admitted as much since he couched his testimony in terms of the "typical" narcotics-related purposes of the seized items. Thus, the testimony was not admissible under Rule 701. *Wilson*, 605 F.3d at 1025 (holding that defense witnesses offered to testify under Rule 701 about the terminology used in drug operations lacked personal knowledge of the events in question); *United States v. Williams*, 212 F.3d 1305, 1309 (D.C. Cir. 2000) (holding that officer who testified that drug users commonly carry weapons "did not establish a factual basis for credible [Rule 701] opinion testimony regarding the likelihood of drug users being armed"); *Oriedo*, 498 F.3d at 602-03 (holding

officer testimony about the way in which drug dealers package crack cocaine for resale was not based on agent's direct observation and thus was inadmissible under Rule 701).

Second, Agent Drewniak's testimony merely told the jury what inferences and conclusions to draw from other evidence. This is not a proper purpose of lay opinion testimony. *Garcia*, 413 F.3d at 214 (holding that the Rule 701(b) protects against the admission of opinions "which would merely tell the jury what result to reach") (internal punctuation and quotations omitted). Such testimony is not helpful to because it "usurps the jury's function." *United States v. Grinage*, 390 F.3d 746, 751 (7th Cir. 2004). Agent Drewniak's testimony was intended for one purpose only: to tell the jury that he believed Mr. Guerrero was operating a cocaine-distribution business out of his bedroom. *See Garcia*, 413 F.3d at 212 (holding that "when an agent relies on the entirety or totality of information gathered in an investigation to offer a lay opinion as to a person's culpable role in a charged crime, he is not presenting the jury with the unique insights of an eyewitness' personal perceptions").

Third, to the extent there was a basis for Agent Drewniak's testimony, it was based on "specialized knowledge within the scope of Rule 702" and therefore not admissible under Rule 701. *Wilson*, 605 F.3d at 1025 (quoting Fed. R. Evid. 701, Advisory Committee Notes on 2000 Amendments). As such, under this Court's

decisional law, the testimony was only admissible if it satisfied the requirements of

Rule 702.  *Id.* (testimony about terminology used in drug operations "falls squarely

into the category of expert testimony"); *United States v. Boney*, 977 F.2d 624, 628

(D.C. Cir. 1992) ("The operations of narcotics dealers repeatedly have been found

to be a suitable topic for expert testimony because they are not within the common

knowledge of the average juror.").

### B. Agent Drewniak's Opinion Testimony Was Inadmissible as Expert Testimony Under Federal Rule of Evidence 702

Both the government and the trial court knew that Agent Drewniak's

testimony had to qualify under Rule 702.  The government had previously

proffered a different ICE agent to the trial court as an expert on the points about

which Agent Drewniak testified, and the trial court had acknowledged the

relevance but rejected the timing of such testimony.  However, when the

government elicited Agent Drewniak's opinion testimony, he had been neither

offered by the government nor qualified by the trial court as an expert under Rule

702.  Furthermore, the government failed to establish, and the trial court did not

require, sufficient foundation to demonstrate Agent Drewniak's qualifications as

an expert.  The record the government made therefore fails to establish any basis

for Agent Drewniak's testimony as an expert witness.

This case is controlled by *United States v. Williams*, 212 F.3d 1305 (D.C.

Cir. 2000).  In *Williams*, the prosecution asked the testifying officer, "In your

25

experience as a patrol officer, is it common for people who use drugs or sell drugs

to carry weapons for protection?" *Id.* at 284. The officer replied, "yes." *Id.* The

officer also testified that he had made gun-charge arrests about eleven times and

had recovered ten to eleven weapons on individuals. *Id.* 285. This Court held that

there was an insufficient foundation to qualify the officer as an expert under Rule

702. According to the Court, "The foundation of Duncan's opinion linking drug

users and possession of weapons is anything but firm. Fewer than one dozen

arrests involving possession of a firearm is not sufficient grounding to quality him

as an expert under Rule 702 of the Federal Rules of Evidence (FRE), particularly

without evidence establishing that any of those arrests involved a drug user." *Id.*

The foundation laid in this case is even weaker than the one in *Williams*, and

the same result must obtain. Here, the only testimony elicited by the prosecution

about Agent Drewniak's background was that at the time of his testimony, he had

worked for ICE for five years as a senior special agent, having previously worked

for the United States Border Patrol for five years and the Federal Air Marshal

Service for two years. 5/19/09 Tr. at 105 (App. 47). No testimony was offered

about Agent Drewniak's duties with any of those law enforcement agencies or

about his training and experience with drug trafficking. Agent Drewniak's

testimony established only that his role during the controlled delivery at 639

Farragut Street NW "was to conduct preoperational surveillance of that address as

well as surveillance throughout the operation of the controlled delivery, as well as to make entry and to secure the premises and search the premises upon execution of that search warrant." *Id.* at 107 (App. 48). Agent Drewniak's testimony is woefully inadequate to qualify him as an expert witness, and his opinion testimony was inadmissible under Rule 702.

### C.    The Admission of Agent Drewniak's Opinion Testimony was Plainly Erroneous

Because Mr. Guerrero's counsel did not object to Agent Drewniak's testimony, this Court reviews its admission for plain error under Fed. R. Crim. P. 52(b). *United States v. Olano*, 507 U.S. 725, 731 (1993). An appellate court may correct an error not raised at trial "where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (internal quotations omitted). The facts in this case satisfy each of these four elements, and the Court should remand the case for new proceedings.

27

1.    *Admission of Agent Drewniak's Testimony was Clearly Erroneous*

The claimed error was clear and obvious.  "Deviation from a legal rule is 'error' unless the rule has been waived."  *Olano*, 507 U.S. at 732-33.  However, failure to object to the admission of evidence, as occurred in this case, is forfeiture not waiver.  *Id.* at 733.  "If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an error within the meaning of Rule 52(b) despite the absence of a timely objection."  *Id.* at 734.  To be reviewable, the claimed error must be clear under current law.  *Johnson v. United States*, 520 U.S. 461, 467 (1997).

The law in this Circuit at all times relevant to this case is that officer testimony about the habits and practices of drug dealers is admissible, if at all, only under Rule 702.  *E.g., Wilson*, 605 F.3d at 1025; *Williams*, 212 F.3d at 1310 & n.7; *Fennell*, 53 F.3d at 1296; *Boney*, 977 F.2d at 628.  Furthermore, the Court acknowledged that such testimony was expert testimony when it rejected similar testimony from Agent Rodriguez on the basis of timing.  5/19/09 Tr. at 103 (App. 46).  The trial court's admission of Agent Drewniak's testimony is clearly erroneous.

2.    *Admission of Agent Drewniak's Testimony Affected Mr.
      Guerrero's Substantial Rights*

Under the third element of the plain error standard, the error must have
affected the appellant's substantial rights.  "In the ordinary case, to meet this
standard an error must be prejudicial, which means that there must be a reasonable
probability that the error affected the outcome of the trial."  *Marcus*, 130 S. Ct. at
2164.  *See also Olano*, 725 U.S. at 1778 ("The error must be real and such that it
probably influenced the verdict.") (internal quotations omitted).

Here, Agent Drewniak's testimony undoubtedly affected the outcome of the
trial.  The evidence against Mr. Guerrero in this case was weak and entirely
circumstantial.  The package containing cocaine was addressed to Carlos Lopez.
Mr. Guerrero signed for it and brought the package to Jose Sacareas, the tenant in
the basement unit.  When officers entered the house in response to the tripped
alarm on the package, they found Mr. Guerrero apparently leaving the basement,
having delivered the package to Mr. Sacareas.  The government introduced no
evidence to suggest that Mr. Guerrero opened the package, actively participated in
its opening, or knew of its contents.  Furthermore, the primary evidence upon
which the government relied to demonstrate Mr. Guerrero's intent to distribute was
the items seized from Mr. Guerrero's bedroom.  It was Agent Drewniak's
testimony that provided the link between that evidence and the distribution of
cocaine.  This is thus not a case in which the evidence of guilt was overwhelming.

29

*See Garcia*, 413 F.3d at 218-19 ("In sum, the totality of the evidence admissible evidence establishing Garcia's partnership role in the charged conspiracy that we can confidently conclude that [Officer] Klemick's opinion of culpability had no substantial effect on the jury verdict of guilty. Thus, we deem the evidentiary error harmless."). Indeed, without Agent Drewniak's opinion testimony telling the jury, in essence, that he believed Mr. Guerrero to be a drug dealer, it is likely that the government would not have met its burden on the question of Mr. Guerrero's intent to distribute cocaine. But the standard is actually much lower. Mr. Guerrero need only show that there is a reasonable probability that Agent Drewniak's testimony affected the outcome of the trial. The facts of this case easily meet that standard.

Furthermore, the prosecution's conduct with respect to Agent Drewniak's improperly admitted opinion testimony shows that Agent Drewniak's testimony was central to its case against Mr. Guerrero. The government made extensive reference to Agent Drewniak's opinion testimony during its opening and closing argument as set out above.

*Garcia* is instructive on this point. In *Garcia*, the Second Circuit held that the trial court erred in allowing a case agent to offer opinion testimony about the defendant's role in a cocaine distribution scheme. 413 F.3d at 204. To determine whether the error was harmless, the court considered, among other things, "the

30

prosecutor's conduct with respect to the improperly admitted evidence." *Id.* at 217. In analyzing this factor, the court recognized the potential harm of having a case agent ascribe guilt to a criminal defendant. *Id.* However, the court held that the "harmful potential was minimized [in that case] by the fact that the prosecution, after eliciting the opinion, never referenced it again throughout the case. . . . Instead, in urging a guilty verdict, the prosecution focused the jury's attention only on the extensive admissible evidence supporting that result." *Id.*

Here, unlike in *Garcia*, in urging a guilty verdict, the prosecution focused the jury's attention specifically and repeatedly on Agent Drewniak's testimony. As such, there is a "reasonable probability that the error affected the outcome of the trial," and the third element of the plain error analysis is satisfied.

> 3. *Admission of Agent Drewniak's Testimony Affected the Fairness, Integrity, and Public Reputation of the Judicial Proceedings*

A reviewing court may recognize a plain error if the error "'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Marcus*, 130 S. Ct. at 2165 (quoting *Johnson*, 520 U.S. at 467). An error may satisfy this standard "independent of the defendant's innocence." *Olano*, 507 U.S. at 736-37. "[I]n most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process." *Marcus*, 130 S. Ct. at 2166.

31

For the reasons stated above, admission of Agent Drewniak's testimony was necessary for the jury to convict Mr. Guerrero.  Without it, the prosecution would have few and very weak pieces of circumstantial evidence to prove Mr. Guerrero's possession and intent to distribute cocaine.  Additionally, the prosecution's extensive reference to Agent Drewniak's testimony in closing reinforced in the jury's mind, at the close of the case, the inferences and conclusions drawn by Agent Drewniak.  The power of Agent Drewniak's inadmissible testimony and the prosecution's reinforcement of that testimony create an inescapable conclusion that the fairness, integrity and public reputation of the trial court proceeding was severely compromised.

Furthermore, the prosecution's conduct in this case shows that the prosecution knew that Agent Drewniak's testimony should have been offered under Rule 702 but instead intentionally elicited it as back-door expert testimony.  Immediately before Agent Drewniak was called to testify, the prosecution had sought to offer expert testimony through Special Agent Anthony Rodriguez but had been denied by the trial court on timing grounds.  *Id.* at 103 (App. 46) ("You can address it [expert testimony] at a later point but not now.").  The prosecution then called Agent Drewniak and elicited the complained-of improper expert testimony without offering Drewniak as an expert to the trial court.  The prosecution's behavior demonstrates it knew that Agent Drewniak's testimony

32

about the narcotics-related uses of the items seized from Mr. Guerrero's bedroom should have been offered under Rule 702. The inference should be drawn that the prosecution intentionally did not offer Agent Drewniak as an expert witness given the judge's previously-stated unwillingness to certify Agent Rodriguez as an expert. Such an intentional flouting of the rules of evidence by the prosecution clearly affected the fairness, integrity and public reputation of the judicial proceeding.

## II.    THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING RELEVANT TESTIMONY BY MR. GUERRERO'S LOW-VISION EXPERT, DR. STEPHEN FEINBERG

Dr. Feinberg was offered, and accepted, as an expert witness expressly qualified by the trial judge to give opinion testimony about Mr. Guerrero's low vision and its implications. However, the trial court sustained the government's objection to Dr. Feinberg testifying that "I do not believe Mr. Guerrero has the visual ability to perform the activities for which he has been charged." 5/21/09 Tr. at 42 (App. 95). In so ruling, the trial court stated: "Well, he's not going to give that testimony in this trial. We went over that yesterday." *Id.* However, no such ruling appears in the transcript of the previous day's proceedings.

The court then encouraged defense counsel to move on because the Court thought that the jury was "fidgety" and because "this can become a tail that wags

this dog, and it's already 11:00 o'clock and we were supposed to have finished this case yesterday afternoon." *Id.* at 42-43 (App. 95-96).

This Court reviews a trial judge's evidentiary rulings for abuse of discretion. *See United States v. Smart*, 98 F.3d 1379, 1386 (D.C. Cir. 1996); *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993). If the decision is found erroneous, the burden is on the government to prove the error was harmless. *See United States v. Lampkin*, 159 F.3d 607, 614 (D.C. Cir. 1998); *Smart*, 98 F.3d at 1390 ("At all times, the burden of proving that an error was not prejudicial rests on the government.").

The trial court abused its discretion in rejecting Dr. Feinberg's testimony. First, the trial court had previously, and correctly, acknowledged that such testimony was relevant. Referring to Dr. Feinberg's testimony, the Court had stated: "We need to focus on what's relevant here, which is what he [Mr. Guerrero] can see, what he could see in October 2008, *what he could do*." 5/21/09 Tr. at 41 (App. 94) (emphasis added). Neither the government's objection nor the trial court's subsequent "ruling" provided a basis to doubt the relevance of the testimony. Certainly, the trial court's concern about the attention of the jury or the length of the trial provided no such basis.

Furthermore, the testimony was clearly within Dr. Feinberg's expertise and he had an adequate basis for that opinion based on both personal observation and

34

the review of Mr. Guerrero's medical records. See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

Nor was Dr. Feinberg's testimony objectionable under Rule 704, which permits opinion testimony on the ultimate issue except when the opinion goes to whether a criminal defendant had the mental state or condition constituting an element of the crime. This Court's decision in *United States v. Salamanca*, 990 F.2d 629 (D.C. Cir. 1993), is illustrative. In *Salamanca*, the Court affirmed the trial court's preclusion of appellant's expert psychologist from testifying whether—because of appellant's alcohol-induced brain damage and his inebriation on the night of the attack with which he was charged—appellant had the ability and capacity to plan the attack with which he was charged. *Id.* at 636. The Court held that this testimony was improper ultimate-issue testimony under Rule 704(b) because it went to appellant's mental state. *Id.* at 637. The Court noted, however, that it would be appropriate for appellant's expert to opine "about the capacities of a person of his [appellant's] mental condition who had consumed the quantity of beer Jose [appellant] allegedly drank on the night of the assault." *Id.* Here, Dr. Feinberg's testimony would have been that Mr. Guerrero did not have the visual abilities to perform the activities he was charged with. 5/21/09 Tr. at 42 (App. 95).

35

This is a question of Mr. Guerrero's "capacities" and was an issue of fact relevant to the jury's determination of whether Mr. Guerrero could have used the items in his bedroom in the manner in which Agent Drewniak opined that he did. This is a question quite apart from whether Mr. Guerrero had the mental state to possess and distribute cocaine.

The trial court's improper exclusion of Dr. Feinberg's testimony was not harmless. It was prejudicial to Mr. Guerrero for two central reasons. First, Mr. Guerrero was denied compelling evidence on an essential point of the trial. The excluded testimony was directly defensive to the Agent Drewniak's improperly-admitted expert testimony about the drug-trafficking purposes of the items seized in Mr. Guerrero's bedroom. It is insufficient and inaccurate for the trial judge to base his exclusion of Dr. Feinberg's testimony on the fact that Mr. Guerrero already has "all kinds of lay testimony already about what this man can and can't see." 5/21/09 Tr. at 43 (App. 96). At best, the lay testimony for the defense about Mr. Guerrero's poor eyesight was in parity with the two government witnesses from Mr. Guerrero's workplace who testified that Mr. Guerrero did not have poor eyesight. Exclusion of Dr. Feinberg's expert testimony thus left Agent Drewniak's improper expert testimony unresponded to. Lay and expert testimony are significantly different and carry different weight with a jury. It was inappropriate for the trial judge to treat them as equal and cumulative. *United States v.*

*Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) (noting that expert testimony carries with it an "aura of special reliability and trust") (internal quotations omitted).

Additionally, the harm was exacerbated by the government's closing argument. The government improperly exploited the trial court's exclusion of Dr. Feinberg's testimony by asking the jury to infer that the defense had no evidence about what Mr. Guerrero could or could not see. The prosecution said, "Ms. Shaner [Mr. Guerrero's trial counsel] suggested that defendant couldn't have seen that [the items seized from Mr. Guerrero's bedroom], but there's no evidence other than what you heard that the defendant was the sole occupant of that bedroom." 5/21/09 Tr. at 93 (App. 107). The government also said, "So Ms. Shaner, if she says the defendant is blind, that's all right. She can say it 20 more times. But that's not a crime in America, to be visually impaired."[8] *Id.* at 117-18 (App. 110-111).

## III. THE TRIAL COURT ERRED IN PERMITTING THE GOVERNMENT TO CROSS EXAMINE MR. GUERRERO'S CHARACTER WITNESS WITH GUILT-ASSUMING HYPOTHETICALS

Mr. Guerrero's neighbor, Christine Lacy, testified to her opinion that Mr. Guerrero was a peaceful and law-abiding citizen. 5/20/09 Tr. at 175 (App. 80). On cross-examination, the government improperly asked Ms. Lacy "guilt assuming

---

[8]     That the government affirmatively argued from the lack of this evidence in its closing proves that the evidence was in fact relevant should have been admitted.

hypotheticals." The colloquy between Ms. Lacy and the prosecutor was the

following:

> Q: Ma'am, knowing the charges, would that change, and the charge is possession with the intent to distribute cocaine, would that change your opinion of this defendant?
>
> A: No.
>
> Q: And if you were told there were two grinders with cocaine residue found in the defendant's bedroom, would that change your opinion?
>
> A: No.
>
> Q: What about empty Ziploc packets used for distributing cocaine. If you were told those were found in the defendant's bedroom, and a significant number, a significant more number [sic] in the basement, would that change your opinion?
>
> A: No.
>
> Q: Would it change your opinion if you heard the defendant had a digital scale used for distributing cocaine in his bedroom, would that change your opinion, ma'am?
>
> A: No.
>
> Q: Would it change your opinion, ma'am, if you heard the testimony that the defendant received a packet, a gold statue laden with over 300 grams of cocaine on that day, and it was found in the basement. Would that change your opinion?
>
> A: No.
>
> Q: And there were [sic] some other cocaine found in the basement or in one of the rooms. Would that chance your opinion?

A:  No.

*Id.* at 183-84 (App. 82).  Each of the six questions set out above presupposed that

Mr. Guerrero was guilty of the very crime for which he was on trial.  None of the

hypotheticals contained in the government's questions to Ms. Lacy had yet been

found as fact by the jury.  Yet the prosecution presented these hypotheticals as

truth to the witness and to the jury charged with making that very factual

determination.

The government's use of these guilt-assuming hypotheticals undermined Mr.

Guerrero's presumption of innocence and unduly prejudiced his ability to defend

the charges against him.  *See United States v. Williams*, 738 F.2d 172, 177 (7th Cir.

1984) (holding that guilt-assuming hypotheticals are impermissible for opinion and

character witnesses because they "allow[] the prosecution to foist its theory of the

case repeatedly on the jury and to force an unsuspecting witness to speculate on the

effect of a possible conviction."); *United States v. Oshatz*, 912 F.2d 534, 539 (2d

Cir. 1990) (holding that guilt-assuming hypotheticals are "prohibited" for opinion

and reputation witnesses because they create "too great a risk of impairing the

presumption of innocence.").

The government's guilt-assuming hypotheticals also violated Federal Rule

of Evidence 405, which permits cross-examination of a character witness only on

"relevant *specific* instances of conduct." (Emphasis added.)  By their very nature,

guilt-assuming hypotheticals are not specific instances of conduct and thus do not comport with Rule 405. *Williams*, 738 F.2d at 177 ("[T]he cross examination of appellant's character witness was [not] an inquiry into specific instances testing the witness' knowledge.").

Indeed, most circuit courts of appeal forbid, on due process and presumption of innocence grounds, the use of guilt-assuming hypotheticals to opinion character witnesses such as Ms. Lacey. *E.g., United States v. Schwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002) (opinion character witness)); *United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) (opinion and reputation witness); *United States v. Mason*, 993 F.2d 406, 408-09 (4th Cir. 1993) (opinion and reputation witness); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1990) (opinion and reputation witness); *United States v. Oshatz*, 912 F.2d 534, 539-40 (2d Cir. 1990) (opinion and reputation witness); *United States v. Williams*, 738 F.2d 738, 177 (7th Cir. 1984) (opinion and reputation); *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) (reputation).

In *United States v. White*, 887 F.2d 267, 274-75 (D.C. Cir. 1989), however, this Court held that guilt-assuming hypothetical questions are permissible for opinion character witnesses.[9] The opinion does not set out the complained-of

---

[9]     In *United States v. Edwards*, 76 Fed. Appx. 335 (D.C. Cir. 2003), this Court, in a *per curiam* opinion, addressed this issue again. The Court's entire discussion of the point was: "Second, appellant argues that the District Court erroneously

questions or provide any details about appellant's arguments on appeal. In a single paragraph, the Court held, without analysis, that the decision whether to permit guilt-assuming hypothetical questions "lies in the discretion of the trial court, and the court did not abuse its discretion here." *Id.* The Court did, however, distinguish between reputation and opinion character witnesses, holding that guilt-assuming hypotheticals are "not error" when posed to opinion witnesses but "may be improper" when posed to reputation witnesses. *Id.*

In *White*, the Court based its holding about opinion character witnesses on *United States v. Polsinelli*, 649 F.2d 793 (10th Cir. 1981), *United States v. Palmere*, 547 F.2d 105 (5th Cir. 1978), and *United States v. Morgan*, 554 F.2d 31, 33 (2d Cir. 1977). These cases, however, do not support the Court's ruling.

*Polsinelli* and *Palmere* dealt only with character witnesses who testified about the defendants' reputations in the community. They thus provide no support for the Court's holding about character witnesses who testify about their personal opinion of the defendant's character. *Polsinelli*, 649 F.2d at 796; *Palmere*, 578

---

permitted the prosecutor to ask guilt-assuming hypothetical questions on cross-examination of the defendant's because guilt-assuming hypothetical questions are not error in this circuit. *See United States v. White*, 887 F.2d 267, 274-75 (D.C. Cir.1989) (stating that cross-examination of witnesses who give their own opinion of the defendant's character with hypotheticals assuming guilt is not error)." *Id.* at 336. This opinion provides no additional support for the *White* decision. Nor does it address the rulings and explanations offered by the other circuits discussed above.

F.2d at 107.  In *Polsinelli*, the Tenth Circuit found the admission of guilt-assuming

hypotheticals to be error when used with reputation witnesses but refused to opine

on the propriety of their use with opinion witnesses.  649 F.2d at 798.

Furthermore, the judge who concurred in the result in *Polsinelli* stated that, in his

view, there is no meaningful distinction between reputation and opinion character

witnesses and that he would have extended the court's ruling to opinion witnesses.

*Id.* at 799 (Barrett, J., concurring).  In *Palmere*, the Fifth Circuit discussed its prior

ruling in *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977), in

which it had found the admission of guilt-assuming hypotheticals to be error when

used with reputation witnesses.  *Palmere*, 578 F.3d at 107.  In *Palmere*, however,

the court was reviewing admission of a guilt-assuming hypothetical for plain error

because defense counsel objected at trial only on the ground of repetitiveness

(because the government asked the same guilt-assuming hypothetical twice).  *Id.*

*Palmere* therefore held, quite narrowly, that on the facts of that case, one asking of

a guilt-assuming hypothetical was not plain error.  *Id.*

Finally, the Second Circuit in *Oshatz* noted that *White* misread its prior

holding in *Morgan*.  The Second Circuit stated:  "[W]e think *Morgan* is quite clear

in its condemnation of guilt-assuming hypothetical questions asked of lay character

witnesses like friends or neighbors, whether testifying about a defendant's

reputation for a character trait or expressing an opinion about such a trait. . . .

*Morgan* is emphatic that a hypothetical question based on an assumption of guilt should not be asked." *Oshatz*, 912 F.2d at 539 (internal quotations omitted).

Given the tenuous ground on which *White* rested its holding and the clear trend in other courts against guilt-assuming hypotheticals, we urge the Court to re-visit its holding in *White* and to find that guilt-assuming hypotheticals of the nature employed in this case are impermissible and to find that Mr. Guerrero is entitled to a new trial.

## IV.    THE CUMULATIVE IMPACT OF THE ERRORS IN MR. GUERRERO'S TRIAL REUIRES REVERSAL OF HIS CONVICTION

Even if this Court determines that each individual error discussed above is insufficient to require reversal of Mr. Guerrero's conviction, when viewed collectively, "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s] [and] it is impossible to conclude that substantial rights were not affected." *United States v. Wood*, 207 F.3d 1222, 1237-38 (10th Cir. 2000) (quoting *Kotteakos v. United States*, 328 U.S. 750, 762 (1946)). Mr. Guerrero's conviction should be reversed.

It is entirely possible that the cumulative impact of two or more individual errors, each individually insufficient to warrant reversal, may "prejudice a defendant to the same extent as a single reversible error. The purpose of a

cumulative error analysis is to address that possibility." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (citing *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988)).  A cumulative error analysis requires that "all the errors that individually might be harmless" be aggregated and requires a court to determine "whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Wood*, 207 F.3d at 1237.  Errors are aggregated no matter their type or the phase of trial during which they occurred.  *See Cargle v. Mullin*, 317 F.3d 1196, 1207-08 (10th Cir. 2003). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error – courts look to see whether the defendant's substantial rights were affected." *Wood*, 207 F.3d at 1237 (internal citations omitted).  Thus, if the cumulative impact of individual errors is such as to have a "'substantial effect' on the outcome or leave[] one in 'grave doubt' as to whether it had such effect," reversal is warranted. *Rivera*, 900 F.2d at 1469 (quoting *Kotteakos*, 328 U.S. at 765).

Although it appears this Court has not had occasion to utilize the cumulative error analysis, the District Court has employed the doctrine.  *See e.g.*, *United States v. Marquez*, 653 F.Supp.2d 1, 4 (D.D.C. 2009); *United States v. Simmons*, 431 F.Supp.2d 38, 54 (D.D.C. 2006).

There is no doubt that the cumulative errors in Mr. Guerrero's trial substantially affected his rights and the fairness of the proceeding. The evidence against Mr. Guerrero was weak, and each of the errors set out above buttressed that weak case. Therefore, Mr. Guerrero's trial was fundamentally unfair and his conviction should be reversed.

## CONCLUSION

For the foregoing reasons, Mr. Guerrero respectfully requests that the Court reverse his conviction and order a new trial.


Dated:  April 1, 2011                    Respectfully submitted,



                                   By:    /s/Robert A. Sheffield
                                          Douglas J. Behr (Bar No. 163998)
                                          Robert A. Sheffield (Bar No. 500464)
                                          Keller and Heckman LLP
                                          1001 G Street, N.W., Suite 500 West
                                          Washington, D.C. 20001
                                          Tel: (202) 434-4100
                                          Fax: (202) 434-4646

                                          Counsel for Leonel Rene Guerrero
                                          Appointed by the Court

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Appellant Leonel Rene Guerrero complies with the type-value limitation of Fed. R. App. P. 32(a)(7)(B) and District of Columbia Circuit Rule 32(a) because this brief contains 10,801 words, excluding those parts of the brief exempted by the rules.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type and style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 point Times New Roman font.

Dated:  April 1, 2011                    Respectfully submitted,

By:    /s/Robert A. Sheffield
Douglas J. Behr (Bar No. 163998)
Robert A. Sheffield (Bar No. 500464)
Keller and Heckman LLP
1001 G Street, N.W., Suite 500 West
Washington, D.C. 20001
Tel: (202) 434-4100
Fax: (202) 434-4646

Counsel for Leonel Rene Guerrero
Appointed by the Court

## CERTIFICATE OF SERVICE

I hereby certify that on this the 1st day of April, 2011, I caused the foregoing Opening Brief of Appellant Leonel Rene Guerrero to be electronically filed with the Court's CM/ECF system and served a copy by electronic mail upon the following persons:

Roy W. McLeese, III, Esquire
(roy.mcleese@usdoj.gov)
Elizabeth Trosman, Esquire
(elizabeth.trosman@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office
Appellate Division, Room 8104
555 5th Street, N.W.
Washington, D.C. 20530
Fax: (202) 307-3569


Dated:  April 1, 2011                     Respectfully submitted,



By:    /s/Robert A. Sheffield_____
       Douglas J. Behr (Bar No. 163998)
       Robert A. Sheffield (Bar No. 500464)
       Keller and Heckman LLP
       1001 G Street, N.W., Suite 500 West
       Washington, D.C. 20001
       Tel: (202) 434-4100
       Fax: (202) 434-4646

       Counsel for Leonel Rene Guerrero
       Appointed by the Court